14820

COLLUM v. SOUTHERN RY. COMPANY

(1 S. E. (2nd), 234)

*Messrs. Hendersons & Salley,* for appellant,

*Messrs. Williams & Busbee,* for respondent,

338

February 13, 1939.

The opinion of the Court was delivered by MR. CHIEF JUSTICE STABLER.

The plaintiff in this case recovered actual and punitive damages in the sum of $1,400.00, and from the judgment entered on the verdict this appeal was taken.

The complaint alleged, among other things, that for some sixty years, and prior to the construction of defendant's railroad, a public road in Aiken County, in which the public had acquired a prescriptive right to travel, existed and extended from what is now State Highway No. 215 to Berlin Station, and therefrom in an easterly direction to the old Wagener-Columbia road; that when constructed, the railroad crossed this public road and, therefore, it became the duty of the defendant to keep and maintain its right-of-way, approaches and roadbed at this crossing in a reasonably safe state of repair for public travel thereon; and that the defendant knew, or should have known, that its failure to perform its duty in such respect "would probably result in property damage to the travelling public using the same." And further: "That on or about said January 22, 1937, plaintiff was travelling said road in his 1935 model Ford V-8 automobile intending to cross defendant's right-of-way and roadbed upon said road at Berlin Station; that plaintiff, in the exercise of due care, having his said automobile under control, and keeping a proper lookout, drove his automobile upon defendant's right-of-way and attempted to cross its roadbed at the crossing at Berlin Station, but when the front of his automobile had gotten across the defendant's railroad tracks, plaintiff's automobile bogged down

into the earth upon defendant's roadbed and right-of-way at said crossing, so that the rear end of plaintiff's automobile did not clear the path travelled by defendant's trains; that plaintiff made diligent effort to extricate his automobile from the bog, but was unable to do so; that while plaintiff was engaged in attempting to remove his automobile, he heard one of defendant's locomotives approaching, travelling toward plaintiff and his automobile in a southerly direction; that thereupon the plaintiff ran down the railroad track meeting said locomotive and train and attempted to flag the same down by waving his pocket handkerchief, but defendant's engineer and agents in charge of said locomotive and train failed and refused to heed plaintiff's warning, and without slackening its speed, continued on at a high, dangerous and reckless rate of speed, and ran into collision with the rear end of plaintiff's said automobile, striking the same with tremendous force and impact and completely demolishing the same."

It was also alleged that the damage done to plaintiff's automobile resulted, directly and proximately, from the negligent, willful and wanton acts of the defendant, in the following particulars: (a) In that it "failed to keep up and maintain its right-of-way, approaches and roadbed where its railroad crosses the public road in question at Berlin Station, as was its lawful duty to do * * * so as to enable the public to travel over the same by automobile and other vehicles without injury to such vehicles, but on the contrary, allowed the crossing at said place to be and remain in such a state of repair that defendant knew, or should have known, that it was dangerous to the travelling public who use the same"; and (b) in that it failed, acting through its agents and servants, "to heed plaintiff's warning when he attempted to flag said train, and to bring said train to a standstill before running into and demolishing plaintiff's automobile, when it saw, or should have seen, that an emergency existed."

Answering the complaint, the defendant interposed a general denial; and, for a second defense, alleged that the plaintiff was negligent, willful and wanton "on the occasion in question in his manner of driving and handling his automobile," and "in his failure, when he discovered that he could not get his said automobile out of the position in which he had placed it, in not making more efficient and timely precautions to warn the engineer and fireman of the predicament in which he had placed his said automobile," all of which acts of negligence and willfulness on his part "contributed to his injury as a proximate cause thereof, without which said injury would not have occurred." The answer also contained a demand, by way of counterclaim, for the sum of $500.00 as damages for injury to defendant's engine.

The case was tried in March, 1938. At the close of all the testimony, the defendant moved for a directed verdict on the following grounds: (1) That the evidence disclosed no actionable negligence or willfulness on the part of the company; (2) that the plea of contributory negligence and of contributory willfulness on the part of the plaintiff had been made out. The trial Judge refused the motion, and whether or not he was right in doing so is the question presented by the appeal.

It is a familiar principle that on motion for a directed verdict, the evidence must be considered most favorably to the adverse party. "The well-established rule in this state is that if there is any testimony whatever to go to the jury on an issue involved in a cause, or even if more than one inference can be drawn from the testimony, then it is the duty of the judge to submit the cause to the jury. This is true, even if witnesses for the plaintiff contradict each other, or if a witness himself in his testimony makes conflicting statements. The credibility of witnesses is entirely for the jury. On a motion for a directed verdict, the evidence in the cause must be considered most favorably to the plaintiff." *Lower Main Street Bank v. Caledonian*

*Ins. Co.,* 135 S. C., 155, 133 S. E., 553, 555. "And it has been decided that, not only should questions of fact be submitted to the jury when they are in dispute, but also the matter is proper for the jury to pass upon when the question is as to inferences to be drawn from such facts, after the facts have been determined." *Kizer v. Woodmen of the World,* 177 S. C., 70, 180 S. E., 804, 808.

With these principles in mind, we turn to an examination of the evidence contained in the record for appeal. There is no dispute as to the law governing in a case where a railroad crosses a public road. If such road was in existence before the railroad was built, then the latter must keep up not only the roadbed, but must also construct and maintain suitable and convenient approaches to the crossing. *Dobbins v. Railway Co.,* 108 S. C., 254, 93 S. E., 932. While counsel for appellant admit this to be true, they take the position that the evidence in the case at bar does not definitely locate the road in question at the Berlin crossing at the time the railroad was built, and that the defendant, therefore, could not be held responsible for the condition of the approaches to the crossing at the time plaintiff's automobile was damaged.

This contention is not in accord with the testimony. D. K. Gantt, a witness for the plaintiff, stated that he was 72 years old, that he had known "the road that crosses the railroad at the point that Mr. Collum is talking about for 50 years," and that "the crossing was there then and has never been changed." He further stated that "the dirt road was there" when the railroad was built. B. Lloyd Hutto, another witness, said that he was 60 years old, and had "helped to grade the railroad"; that several roads "merged into this crossing," and that one of them "came up and across the crossing right where it is now." T. A. Blizzard testified that he had lived in the vicinity of the wreck about 50 years, and knew when the railroad was put through from Perry to Columbia; that he helped to grade it, and that the crossing was "just about" the spot where it is now.

As to defendant's negligence or willfulness in the care of the railroad crossing in question, we think more than one reasonable inference could be drawn from the evidence thereabout. The plaintiff testified in part as follows: "On January 2, 1937, it had been raining that morning, and I started to the lower place to see about some terraces and came down No. 215 highway, and they were plowing it up, and I came to the crossing at Berlin Station, and I stopped my car"; and "as I went to cross the crossing I was in low gear and the roadbed was wet and soft and it pulled me into a bank and I backed up and bogged down, and I scratched dirt from under the wheel and got in and bogged up again. The bumper was resting on the tie and the housing was on the ground, and I couldn't move it and I heard the train blow, and I ran down the track to flag it." He further stated that where his automobile bogged up, "it was soup of mud right up to the tires"; that when his car "hit that wet and soft sand it pulled me off the road about eight inches," and that "the front of the car was headed against the bank"; that the road was sandy up to the crossing, and that "there was no cinders and clay at the end of the ties where the wheels bogged up."

Mrs. Lena Rawl stated that she lived about 125 yards north of the station and saw a part of the wreck; that when she reached her porch Collum "had cranked the car, and the automobile went to racing"; that "he got out and scratched the sand and got back in the car and it would not pull, and he got his jack and had to jack it up and he heard the train. I heard the train and hollered at him, and he went down the road to flag the train, and the train didn't slacken or slow up until it hit the car." She also stated that "the road at the crossing is sandy and the sand comes in from two roads there at the crossing and has two ruts running straight from the crossing and going out to where his farm was"; that the "crossing is used by a great many automobiles, but it is sandy and not a good crossing at all." Hoyt Rawl testified that he had lived in the community about

thirty years; and that "the crossing is a sandy narrow crossing," and was that way at the time of the wreck; that he "didn't go there until the next evening and the place was worked over then"; that the bank there "was where sand had been drifted in from the roads and was thrown out. It is deep sand and it comes from two roads there. The crossing was in about the shape it had been in for several years."

There was other testimony to the effect that this ■ crossing had been in bad condition for several years, and that at least one section foreman of the defendant had been advised of that fact and that he had promised to repair it, but that this was not done until after the accident occurred. We think it could be reasonably inferred from the evidence pertinent to this issue, as a reading of it discloses, that the defendant knew for a long while, or should have known, of the condition of the crossing as testified to, 'and that there was a conscious failure on its part to perform its duty thereabout. We are of opinion, therefore, and so hold, that this testimony—which was in sharp conflict with that offered by the appellant—required the submission to the jury of the question of defendant's negligence and willfulness in the care of the crossing. See *Tinsley v. Western Union Telegraph Co.*, 72 S. C., 350, 51 S. E., 913; *Spears v. Railroad Co.*, 92 S. C., 297, 75 S. E., 498.

Was there any evidence of negligence or willfulness in the management of the train upon the occasion in question? We have quoted some of the testimony with respect to the condition of the crossing, as testified to by the plaintiff and his witnesses, and as to the situation there at the time the plaintiff heard the whistle of the defendant's train. It was also testified that there was a curve in the railroad about 125 yards from the crossing, in the direction from which the train was approaching, and that the crossing could not be seen before that point was reached.

The plaintiff testified: "I heard the train blow, and I ran down the railroad to flag it, and he did not pay any atten-

tion and went right on across and hit the car. I flagged with my handkerchief. I went towards the train in the neighborhood of 200 yards. The train was travelling about 60 miles an hour." He also stated that "the blowing I heard must have been a station blow about a mile away." Mrs. Lena Rawl testified on this point as follows: "I heard the train and hollered at him, and he went down the road to flag the train, and the train didn't slacken or slow up until it hit the car. The road is not straight, and there is a curve." With regard to the distance that the plaintiff ran up the road in his effort to stop the train by flagging it, she said that "he went about 175 or 200 yards." Mrs. Ida Brown, a witness for the plaintiff, stated that she saw the train strike the automobile, and that "the engine stopped about even with my house, which is about 200 yards or better towards Perry from the crossing."

The witness Broom, the defendant's locomotive engineer, testified that "I blew the station blow on mile, and I blew the next road crossing that goes to the schoolhouse, and then I started around the curve," and that he could see the crossing when he was about 100 yards from it; that he was running at the time about 30 miles an hour, and if he had applied his emergency brakes 200 yards before he got to the crossing, he could have stopped before reaching that point, but that he did not see the plaintiff coming down the track waving his handkerchief. He further stated that it was his duty to bring the train to a stop had he seen the plaintiff doing so, as there is a rule of the railroad company requiring this to be done immediately when any kind of an object on the side of the track is being waved. Elliott Prater, fireman on defendant's locomotive engine, and whose duty also was to keep a lookout, testified that it was about 150 or 200 yards from the crossing around the curve before you are on the straight stretch of track; that he did not know exactly how fast the train was running that day, but that it was about medium; and that he saw the plaintiff "run-

ning along and waving a handkerchief at us," but that he saw him and the automobile about the same time.

As is seen, the testimony pertinent to a proper determination of this question was in sharp conflict on material points. In other words, more than one reasonable inference may be drawn therefrom as to the defendant's negligence or willfulness in the management of its train upon the occasion in question. Whether the plaintiff got around the curve to flag the train in time for the engineer to stop it before reaching the crossing, and whether the engineer or fireman saw him and consciously failed and refused to perform his duty thereabout, or whether the engineer and fireman were not keeping a proper lookout and for that reason failed to see the plaintiff, or whether the engineer was running the train at a high and dangerous rate of speed on approach to the crossing, which prevented his stopping the train even if he saw the plaintiff in time to do so, were all, under the evidence, matters for the jury. The credibility of the witnesses was also entirely for them, and in refusing defendant's motion for a directed verdict, the trial Judge was bound to view the testimony in the most favorable light to the plaintiff. We think, therefore, that this question was for the jury, and was properly submitted to them.

In considering and disposing of the first ground of defendant's motion for a directed verdict, we have kept in mind, as urged by counsel for appellant, the fact that the Berlin Station, admittedly, is in a sparsely populated country community. In this connection, however, we have also noticed the undisputed evidence that this crossing is used by a great many automobiles, and that there are six roads leading off from it, three approaching it from the east side and three from the west side.

As to the second ground of defendant's motion, to wit, that the plea of contributory negligence and contributory willfulness on the part of the plaintiff had been made out, it is sufficient to say that this question

under the testimony, which we deem it unnecessary to review further, was undoubtedly one for the jury. The trial Judge, therefore, properly refused to direct a verdict on that ground.

The appellant also argues that the Court committed error in refusing to instruct the jury, upon its request, as follows: "I charge you that there is no evidence of wilfulness, wantonness or recklessness on the part of the railroad; hence, this question is eliminated from the case and no punitive damages can be awarded." If the defendant's motion for a directed verdict as to punitive damages was properly refused by the trial Judge, as we hold that it was, it would have been error on his part to so charge, for in effect it would have amounted to the direction of a verdict on that issue.

All exceptions are overruled and the judgment of the Circuit Court is affirmed.

MESSRS. JUSTICES BONHAM, BAKER and FISHBURNE concur.

MR. JUSTICE CARTER did not participate on account of illness.