235 S.C. 467 (1960)
112 S.E.2d 400
A.D.B. REALTY CORPORATION, Appellant,
v.
ORIENT INSURANCE CO., Respondent.
17602
Supreme Court of South Carolina.
January 12, 1960.
*468 Messrs. Lee & Moise, of Sumter, for Appellant.
Messrs. Nash & Wilson, of Sumter, for Respondent.
*469 January 12, 1960.
OXNER, Justice.
This is an action on a policy insuring a residence of appellant against "All Physical Loss". Respondent Insurance Company denied liability upon the ground that the damage to the property came within an exclusionary clause which provides that the policy does not insure against loss by "* * * normal settling, shrinkage or expansion in foundations, walls, floors, or ceilings; * * *".
On the trial of the case, each party made a motion for a directed verdict at the conclusion of the testimony. The trial Judge refused both motions and submitted the case to the jury which returned a verdict in favor of the Insurance Company. Appellant thereupon made a motion for judgment non obstante veredicto or, in the alternative, for a new trial. This motion was refused.
We shall first discuss the exceptions charging error in refusing appellant's motion for a directed verdict. This necessitates a rather extended review of the testimony.
Appellant corporation purchased a fine residence in the city of Sumter which was built in 1906. It was one of the best constructed houses in that area. Mrs. Alice D. Boyle is president of appellant and its principal, if not sole, stockholder. She and her husband, Edwin B. Boyle, a prominent and successful businessman of Sumter, planned to use this residence as their home. They completely renovated and *470 decorated it but made no major structural changes. New cornices were put up in a number of the rooms. Some of the picture molding was elevated. The stairway leading into the attic was widened. The varnish on the woodwork was removed and the house painted both inside and outside. Mr. Boyle testified that the plastering was in good condition and that there were only a few minor cracks.
Around noon on Saturday, January 4, 1958, after the house had been cleaned, Mrs. Boyle locked it up and left the heat on, planning to move in one Monday or shortly thereafter. When she returned on Monday, she found that the plastering had cracked in almost every room, several mantels were loose and about three-fourths (3/4) of an inch from the wall and the wainscoting had pulled out about one-eighth (1/8) of an inch from the wall. The testimony does not disclose the exact temperature during this weekend or when the heat was first turned on. Mrs. Boyle testified that she did not "recall it being cold" and that "we had heat on about 65, normal." There is no testimony of any unusual occurrence in Sumter about this time or that any other house was damaged.
After the foregoing occurrence, the cracks in the plastering were filled, the walls repainted and floors refinished but no effort was made to do a complete repair job so as to place the house in the same condition it was in on January 4th. Mr. and Mrs. Boyle moved into this home during the second week in March, 1958. On March 21st, while in the den, Mr. Boyle heard a faint noise behind his chair and found that the plastering had cracked in several places. He said there was a "bulging out of the skim coat". Upon examining the other rooms, several cracks were also found in the kitchen but they were not as extensive as those that appeared during the weekend of January 4th. On the following day, March 22nd, a drain pipe in an upstairs bathroom started leaking, with water dripping through the ceiling into the dining room.
*471 The testimony of Mr. and Mrs. Boyle is somewhat conflicting as to whether the plastering cracked only on the two occasions above mentioned. Mr. Boyle said that there was "no continuous cracking of the walls" and no further cracks appeared after March 21st, while Mrs. Boyle testified:
"Q. Miss Alice, I understand you to say that has been a continual process since you have been in the house? A. Yes.
"Q. That correct? A. Yes, sir.
"Q. And places that were even repaired after the 4th of January, have cracked again? A. Yes.
"Q. And, well, did you hear any noises in the house, when they cracked? A. No, I don't recall any.

* * *
"Q. This has been continuous and continual, is that correct? A. I would think so."
It is conceded that there was a "physical loss" to this house. Appellant is, therefore, entitled to recover unless the damage comes within the clause excluding loss by "normal settling, shrinkage or expansion in foundations, walls, floors, or ceilings." Appellant says that there is no evidence that the damage resulted from any of these causes while respondent contends that the damage was caused by normal contraction and expansion of the plastering, or at least more than one reasonable inference can be drawn thereabout, necessitating submission of this issue to the jury.
Appellant's experts were unable to explain exactly what caused the plastering to crack. One said the damage was caused by "some abnormal disturbance" by which he meant something "other than usual course of things." Another said that "there was not a usual circumstance that caused the cracking." Several conceded that "expansion and contraction do cause cracks" but stated that it would have to be "more than usual" to have caused the cracks in this house. However, one of appellant's experts testified:
*472 "Q. Now, Mr. Gibson, if there were extensive work being carried out there, in a big building of that type, that building, during the winter, and the building were left open, and filled up with cold air, and it was suddenly closed up tight, heat applied, heat turned on it in the closed up building, would that have any effect on the expansion and contraction? A. Possibly.
"Q. Very probable? A. If it had been left open up until the January when the time this thing is supposed to have happened, if it had been left open just until a few days before that and then put the heat on, I can possibly see how that could have caused it, but if the heat had been on three or four months prior to that, I don't see any possibility."
We now turn to the testimony offered by respondent. One of its expert witnesses who examined this house in May after the occurrence said that he found that new cornices had been put up and "apparently anchored both to walls and ceilings and that all of the paneling that had been repainted in a light color had been puttied up, patched and painted with a tenacious paint, so that it made just one homogeneous panel. There were no cracks at the edges that ordinarily would be at ceiling and floor."
He further testified:
"Q. What effect does it have to paint this building and to varnish it, what effect would that have on the contracting and expansion, if you have those puttied up places like you told us about? A. If we seal it at both top and bottom, what we would do is confine the normal movement of that wall, a wall or floor or, every component part of a building moves and breathes * * *. And so, if we would putty these things up and putty them solid and we had a cool wall for instance, if it was cool weather when we did the work and we confined a wall from both floor to ceiling, then when that wall started to warm, the surface would expand and you would get a condition like that 
*473 "Q. A bulge in the plaster? A. Yes, sir, it would have to bulge.
"Q. It would have to give somewhere? A. That's right.

* * *
"Suppose it had been opened with the people working in there and they closed it up on Saturday afternoon, left the heat on, or turned the heat on, came back Monday and found this condition that you described and has been described by the witnesses here, to what could you attribute and what do you attribute that condition to? A. Of course, I could only theorize, sir, but there is no question in my mind what could happen. If those walls were cold before the heat was turned on, that in warming, those very conditions would show themselves if the walls and ceiling were confined at their extremities, then something would have to give in the middle.
"Q. And that is what you found? A. That is the condition I found. Also, I found that in some of the woodwork the putty had actually been pushed out of the joints so that it was from compression, there was no other way that putty could put out other than the compressive force from the side.
"Q. So you attributed it to the compression? A. Yes.

* * *
"Q. And the bulging out of the skim plaster is caused from the compression? A. Yes.
"Q. From the expansion? A. Well, it is because the material can't compress, it has got to go some place else and it just comes out.
"Q. Well, now, were most of these bulges that you saw in the walls when you were there, were they crossways of the room or up and down in the room? A. They were either horizontal or a little bit diagonal, they were more horizontal than vertical.
"Q. Being more horizontal, would you say that is typical of any condition? A. Yes, I would say it was typical that *474 most of the force was being applied from top to bottom, the confinement of the particular panels in question were vertical.
"Q. Up and down? A. Yes.

* * *
"Q. Then it is your contention that this little strip of paint, is what was keeping the wall or ceiling or any other thing from expanding and contracting and causing the plaster to crack, is that your contention? A. Yes, sir, it prevented the normal expansion of the wall.
"Q. Just that coat of paint? A. Yes, sir.

* * *
"Q. Yes, sir, and it is your contention that the bulge was caused solely by where the paint from the top of the baseboard and the crown moulding hit the wall, is that your contention? A. I think so, but I will say positively they were caused by compression.
"Q. You don't know what caused the compression? A. No, sir, but that is the only thing I can conclude.
"Q. Well, was it a normal amount of compression or a fairly unusual compression? A. Unusual.
"Q. And that was true wherever you saw this? A. Yes, sir.
"Q. Unusual compression and not normal. A. That's right."

* * *
"Q. It is your contention that the paint caused all the damage? A. That's right, the paint served as a glue, and a good glue.
"Q. And I believe you testified that the damage was certainly not normal, the damage you saw. A. No, sir, it was not normal.
"Redirect Examination
"By Mr. Nash:
Q. And you also testified it was caused by expansion? A. That's right, it was the confining of the normal expansion."
*475 Another expert witness for respondent who examined the house just prior to the trial testified in part as follows:
"Q. Now, the testimony in this case is that on or about the 4th of January, the painting and work that had been done in the house prior to that time, that the weather was rainy and damp, that on the 4th day of January the house was closed up about midday, and the heat was on, they came back in on Monday and found cracks in a number of rooms, practically all of them, I believe. * * * Now, will you explain to this jury what in your opinion could have caused that and why? A. Well, the cracks are mostly compression cracks, and expansion cracks, because the white-coat is popped off in places and standing out, bulging, and still holding. That means the plaster was expanding, going together, pushing from one side of the house to the other and pushing that way, which is an expansion crack. If it were the opposite way they would have pulled open and left a hole. These were mostly all compression cracks. The house could have gotten hot. If it had gotten hot then the whole inside of the house would have expanded more than normal and that could have broken them open, something of that nature. Or if the house is kept at eighty degrees for three days, it could have popped off newly patched plaster.

* * *
"Q. The testimony of one of the witnesses for the defendant, Mr. McKibben, was that that wall had been freshly painted, and where it wasn't painted that the woodwork was shellacked; that the paint had gotten held on to the cornices around the wall, they were up to the top of the ceiling, and, what effect would that have on the expansion of this building with the heat on it and closed up for this period of time? A. It would shrink the wood, and I noticed this while I was there, the wood panels in the dining room that were painted off, were shrunk, some of them showing a sixteenth of an inch where the panels had gone down, and in the hall they had done the same thing. The cover moulding was so wide, that it would have shrunken and pulled itself *476 loose on each end and broken the paint, so you would have a good deal of wood shrinkage if the place got hot, even normally hot, even eighty degrees for three days would shrink wood badly."

* * *
"Q. The testimony is that either two or three mantels had pulled loose from the place they were in. How do they usually put mantels in? A. I looked at the mantels, they are mostly back now except one, I think in the den, it was pulled away maybe an eighth of an inch, or had never been put back tight.

* * *
"Q. Now, it was testified to that on Saturday, January 4th, at twelve o'clock, the plaster and the woodwork in this house were in good condition, that none of these cracks that you have seen were noticeable, that the mantels were up against the walls in their regular places, that the woodwork was joined together and did not have those expansion joints as you saw in them, and that on Monday, when the house was reopened, that the walls in practically every room were cracked and damaged, the mantels had come out from the walls, some plaster had come down and fallen on the floor, and the wainscoating, some of the joints in the woodwork had come apart and the wainscoating was pulled apart. If. that situation appeared between twelve noon on Saturday and Monday or Tuesday of next week, could it have resulted from normal settling or shrinkage in that house? A. We will eliminate settling, I don't think there is any settling in the house at that stage. It could from a matter of shrinkage caused by a heat condition."

* * *
"Q. Could it have normally in that short period of time have caused every room in the house to crack, or practically every room, and the woodwork come loose, joints and mantels come off from the wall, a house fifty years old and had been lived in? A. Yes, if you got the heat up to eighty degrees and kept the house closed at eighty for that length of time, yes."

* * *
*477 "Q. Counsel asked you about all this happening one night, whether or not it was normal. Would it have been normal under the circumstances you have described, and happened in this case, with reference to the reworking, revarnishing, repainting, house being shut up, heat on, and what does that indicate to you? A. Heat."
In determining whether the Court below erred in refusing appellant's motion for a directed verdict, the testimony must be viewed in the light most favorable to respondent. If more than one reasonable inference can be drawn therefrom, or if the inferences to be drawn from the testimony are in doubt, the case was properly submitted to the jury. Lynch v. Pee Dee Express, Inc., 204 S.C. 537, 30 S.E. (2d) 449. This is true even if the witnesses for one of the parties contradict one another, or if one witness himself in his testimony makes conflicting statements. Collum v. Southern Railway Co., 189 S.C. 336, 1 S.E. (2d) 234. It is the function of the jury to select among conflicting inferences and conclusions that which it considers most reasonable.
While the jury here could have well concluded that the damage to this house was covered by the policy, that is not the only reasonable inference warranted by the testimony. It is not unreasonable to infer that the damage was caused by normal expansion. While no case has been cited by counsel, nor have we found any, construing an exclusion clause similar to the one involved in this case, we think it is clear that the extent of the damage is not conclusive as to coverage. It may be extensive and yet be caused by expansion or contraction normally to be expected. The jury was permitted to view this house. They saw the cracks and other damage and were able doubtless in this way to get a more complete picture of the situation than the bare record discloses. Morgan v. Greenville County, 189 S.C. 368, 1 S.E. (2d) 144. We cannot say that the verdict is wholly unsupported by the evidence.
*478 The next exception is to the effect that the Court erred in admitting evidence as to whether or not the damage was caused by a sonic boom. Over appellant's objection, it was brought out during the cross examination of Mr. and Mrs. Boyle that at first they thought the damage might have been caused by a sonic boom and an expert witness for respondent was permitted to testify that this was not the cause of the damage. This evidence, even if inadmissible, was not prejudicial since throughout the trial respondent's counsel admitted that any damage from this source would be covered by the policy and the Court expressly charged the jury that if they found that the damage was caused by a sonic boom, it would be covered by the policy and they would find a verdict for plaintiff.
The remaining exceptions relate to the charge. It is contended that the Court erroneously charged the jury that proof of damage alone would not entitle appellant to recover and further improperly placed upon appellant the burden of proving the cause of the damage. Although the main charge is not as clear as it might have been, we do not think it reasonably susceptible to the interpretation which appellant's counsel place upon it. The jury was instructed that the phrase "all physical loss" means "any loss which is not within the exceptions of the policy" and that the burden was upon the defendant to establish by the greater weight of the evidence that the damage came within the exclusion clause. But assuming that the charge was misleading, any error was later corrected. At the conclusion of the main charge the jury was excused and the following occurred:
"The Court: Any exceptions to the charge by the plaintiff?
"Mr. Moise: Your Honor, we understood Your Honor to charge that if the plaintiff had proved the damages, that that standing alone would not entitle plaintiff to a recovery under the policy, but the plaintiff would have to go on and show what caused the damages. If that was Your Honor's *479 charge we wish to except it. Our position being that if the plaintiff has proved the fact of damage, it would be entitled to recover unless the defendant by the greater weight of the evidence proved it came within the exceptions.
"The Court: If I said that I didn't intend to say that. My understanding of the law is that, and I so charge the jury, that the burden of proof was on the defendant to prove that the loss occurred under one of the exceptions. Now, you have the burden of proof as to your damages, and that the loss occurred. But unless he can prove it came under one of the exceptions, of course, that would be all that would be necessary.
"Mr. Moise: Yes, sir, I understood you to charge, you may not have intended to do it, that if the plaintiff established damage they must go further and establish the cause.
"The Court: Well, I will recharge then on that. Any requests to charge?"
The Jury was then brought back and given the following instruction:
"Mr. Foreman and Gentlemen of the jury, there is one matter I wish to charge you on that I may have inadvertently not charged you on, and that is that the burden of proof is upon the plaintiff to prove his damages or loss in this case, and that the burden is upon the defendant to prove that such damage or loss came within one of the exceptions in the policy, because as I have defined all physical loss to you, all physical loss, my interpretation of it, and I so charge you, under this policy, means any loss which does not come within the exceptions. And the burden of proof is upon the defendant to prove by the greater weight or preponderance of the evidence that the loss comes within these exceptions."
The jury was thereupon permitted to go to lunch. After they left the courtroom, the following occurred:
"The Court: Does that cover your objection, Mr. Moise?
"Mr. Moise: We don't think it covers it completely sir, but we think 
*480 "The Court: Well, you write it out.
"Mr. Moise: I will put it in the record. We think you should charge the jury that if the plaintiff establishes a physical loss as you have defined it, that the plaintiff would be entitled to recover, unless the defendant should prove that it came under some one of the exceptions.
"The Court: That is just what I said, probably not in that many words.
"Mr. Moise: And that the burden is not on the plaintiff to prove what caused the loss. That is what we objected to. We thought you charged the jury the plaintiff had to show what caused the loss. And we say that under the policy that is up to the defendant."
No further instructions were given the jury after the foregoing colloquy.
While the charge might have been a little clearer if the Court had expressly stated that the burden was not on the plaintiff to prove the cause of the damage, the jury must have so understood. We cannot say the instructions were misleading.
Affirmed.
TAYLOR, LEGGE and MOSS, JJ., concur.
STUKES, C.J., did not participate.